IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WENDELL SWEET;
and STEVEN SWEET,

      Plaintiffs,

v.

AUDUBON FINANCIAL BUREAU, LLC;
DEBT MANAGEMENT PARTNERS, LLC;
and KYAN JULIUS,

      Defendants.

## COMPLAINT FOR DAMAGES AND JURY DEMAND

1.     Defendant Audubon Financial Bureau, LLC ("AFB") – which was collecting for and is wholly owned by Defendant Debt Management Partners, LLC – falsely stated to Plaintiff Steven Sweet that he was obligated to pay on a payday loan that had been obtained by his father, Plaintiff Wendell Sweet. AFB falsely told Steven Sweet that his father, Plaintiff Wendell Sweet, had forged Steven Sweet's signature on the loan, so Steven Sweet was personally responsible for paying off the loan. AFB falsely stated that a lawsuit had been initiated or was about to be initiated on the payday loan. When an employee of the New Mexico Attorney General telephoned AFB, Defendant Kyan Julius, a management employee of AFB, falsely told the Attorney General employee and Wendell Sweet that AFB's license as a New Mexico collection agency "was being taken care of," or words to this effect. Mr. Julius also falsely stated that AFB would provide verification of the debt, but it never did, yet it continued to try to collect on the debt. AFB also falsely represented, in emails to Wendell Sweet, that a payment agreement had been reached

between AFB and Wendell Sweet which allowed AFB to debit monies from Wendell Sweet's bank account.

## Jurisdiction

2. This Court has jurisdiction under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA"), *see* 15 U.S.C. § 1692k(d), and under 28 U.S.C. §§ 1331 & 1337. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## Parties

3. Plaintiff Wendell Sweet and Steven Sweet, father and adult son, reside separately in New Mexico, with Wendell Sweet residing in Albuquerque and with Steven Sweet residing in Rio Rancho.

4. Defendant Audubon Financial Bureau, LLC ("AFB") is a company based in New York state whose principal business is the collection of consumer debts. It regularly collects or attempts to collect debts originally owed or due or asserted to be owed or due another. AFB is a "debt collector" as defined by the FDCPA. *See* 15 U.S.C. § 1692a(6).

5. Defendant Debt Management Partners, LLC ("DMP") is a company based in New York state whose principal business is the collection of consumer debts. It uses wholly-owned debt collection companies like AFB to regularly collect or attempt to collect debts originally owed or due or asserted to be owed or due another. DMP is a debt buyer. It acquires debt accounts after the accounts are in default. AFB is a "debt collector" as defined by the FDCPA. *See* 15 U.S.C. § 1692a(6).

6. Defendant Kyan Julius operates, oversees, approves, ratifies and is personally involved in the collection operation run under the name of AFB. He personally participated in the

collection efforts that AFB directed to Plaintiffs, including speaking with the employee of the New Mexico Attorney General that was investigating the collection tactics that AFB had directed towards Plaintiffs. Mr. Julius is a "debt collector," as defined by the FDCPA. *See* 15 U.S.C. § 1692a(6).

## Facts

7. Wendell Sweet obtained a payday loan from The Cash Store in Albuquerque, New Mexico.

8. The loan was in his name only. He is the only signatory on the loan contract.

9. Wendell Sweet obtained this payday loan for personal, family or household purposes, specifically to pay bills and cover everyday living expenses.

10. Wendell Sweet fell behind on his payments.

11. DMP purchased Wendell Sweet's loan with The Cash Store as part of a portfolio of payday loans (and perhaps other debts) it purchased.

12. DMP directed AFB to collect on this loan on behalf of DMP.

13. AFB is wholly owned by DMP.

14. Mr. Julius is a management employee of AFB.

15. On February 7, 2013, a person who identified himself as Chandler Gates (believed to be a false name) from AFB telephoned Stephanie Sweet, Steven Sweet's wife, on her cellphone while she was at her place of employment. Mr. Gates told Ms. Sweet that he was looking for Steven Sweet in regard to Wendell Sweet. Ms. Sweet told Mr. Gates to call her husband.

16. On February 7, 2013, at approximately 10:00 a.m., the following voicemail message was left on Steven Sweet's cell phone:

> Good afternoon. This message is intended for Steven Sweet. Steven, my name is Chandler Gates with AFB and Associates. I'm looking to speak with you in regards to a civil judgment complaint which is set to be filed against Wendell Sweet. You were listed here as a person of interest as well as primary respondent in this case. Due to the severity of the case, I wanted to receive a statement from you here immediately. The phone number you can use to contact me is (866) 597-7275, at extension 115. Thank you.

17. At the time that AFB left this message, neither it nor DMP intended nor had the ability to file a civil lawsuit against either Plaintiff, procure criminal charges against either of them or obtain any sort of judgment against either of them.

18. Steven Sweet was upset and startled by this message. He called the telephone number left in the message within minutes of listening to it.

19. Steven Sweet talked with the person who identified himself as Chandler Gates. Mr. Gates told Steven Sweet that he was a "primary respondent" in the lawsuit concerning the account. He recited Steven Sweet's social security number to him. Mr. Gates stated that $8,394.28 was owed on the account, but that AFB would settle today for $2,000. Mr. Gates told Steven Sweet that he was a co-signer on the account and thus was personally responsible for paying it off. Mr. Gates stated he had a documents that showed Steven Sweet was a signatory on the loan. Mr. Gates stated that if Steven Sweet had not signed the loan, his father must have forged his signature. Mr. Gates stated that AFB was trying to reach Steven Sweet's father as well.

20. As soon as this call with Mr. Gates ended, Steven Sweet sent a text message to his father, in which he asked his father to call him right away.

21. His father called in response. Steven Sweet told Wendell Sweet about the voicemail message that he had received and his conversation with Mr. Gates. Wendell Sweet told Steven Sweet that he had not forged his son's name on any loan documents. Father and

son grew angry and upset with each other and argued. Steven Sweet told his father he could not understand how Mr. Gates had his social security number if he was not on the loan. Wendell Sweet told his son that he would never do such a thing to his own son.

22. Wendell Sweet was deeply embarrassed about his son finding about the payday loan, especially given the way his son found out.

23. Shortly after the call between father and son ended, Wendell Sweet telephoned Mr. Gates. Wendell Sweet was very upset during this call. He asked that Mr. Gates not "mess with" his family. Mr. Gates responded that he "was from New York." Mr. Gates told Wendell Sweet that his son is shown as a co-signer on the loan and is personally responsible for paying it off. Wendell Sweet ended this call by hanging up.

24. Wendell Sweet called AFB two or three more times that same afternoon in an attempt to discover AFB's exact name.

25. About 5:00 p.m. that same day (February 7, 2013), Steven Sweet again called the telephone number that had been left in the voicemail message. He asked to speak with a manager. A man came on the line. He asked this man for the name of the original creditor. The man stated he would not give out this information unless Steven Sweet first stated that he was willing to pay off the account. This man told Steven Sweet that he had documents that showed his father had listed his name and social security number on the loan documents as a co-signor. This man stated that Steven Sweet could be sued on the loan. This man stated that Steven Sweet should prosecute his father because his father had lied to him. This man told Steven Sweet that his father was a "liar." He asked Steven Sweet, "What kind of relationship is it that you have with your father"?

26. Upon information and belief, the man on this telephone call with Steven Sweet and who

5

made the above statements to him, who identified himself as a manager at AFB, was Mr. Julius.

27. The next morning (February 8, 2013), Steven Sweet received another voicemail message from AFB. In this message, the caller falsely stated that Steven Sweet "had called in looking to set up arrangements."

28. That same morning, Steven Sweet again telephoned AFB. He spoke to Mr. Gates. He asked that he be told the name of the original creditor. Mr. Gates told him that the loan was from The Cash Store.

29. That same day, Steven Sweet drove to The Cash Store's location at 333 San Mateo Boulevard SE in Albuquerque. He stated that he wanted to see the paperwork from any loan taken out by his father, Wendell Sweet, so he determine for himself whether he was listed as a co-signer. The employee at the store told him that she could not comply with his request. However, she provided him with a telephone number for The Cash Store's administrative office.

30. That same day, Steven Sweet called the telephone number he had been given for The Cash Store's administrative office. He told the person that he spoke with that he wanted to see the paperwork from any loan taken out by his father, Wendell Sweet, so he determine for himself whether he was listed as a co-signer. He explained why he wanted to do so. This person stated that it was not possible that his father had listed him as a co-signer because The Cash Store does not allow co-signors on its loans.

31. That same day, Steven Sweet went to his father's place of employment to tell his father what he had learned. His father was still very upset. His father repeatedly told him, "You didn't trust me."

32. On February 13, 2013, Wendell Sweet went to the Office of the New Mexico Attorney General that is located in Albuquerque. He met with Casey Carr, an employee, and told Ms. Carr what had happened with the debt collection company that was harassing him and his family. He told Ms. Carr that he wanted to make a complaint with the Attorney General but that was unsure of the exact name of the debt collection company.

33. Ms. Carr placed a call to the telephone number that Wendell Sweet had called earlier. She placed the call on a speaker phone with Wendell Sweet in the room.

34. Ms. Carr asked the person that answered for the name of the company. This person stated "Audubon Financial Bureau."

35. Ms. Carr asked this person if Audubon Financial Bureau was licensed as a collection agency in New Mexico. This person asked her to hold, stating that a manager would come on the line to talk with her.

36. When a man who had been identified as a manager picked up the line, he stated that he knew what this was about and that he would be in New Mexico later that same week about "this case."

37. Ms. Carr told him that this matter involved Wendell Sweet and that she was unclear on what other matter to which he was referring.

38. Ms. Carr again asked, this time to the manager, if Audubon Financial Bureau was licensed as a collection agency in New Mexico. The manager stated that the license issue "was being taken care of," or words to this effect.

39. Ms. Carr also asked the manager to provide verification of the debt that AFB was trying to collect from Mr. Sweet. The manager stated that verification would be provided.

40. Verification was never provided. Neither AFB nor DMP ever provided any information

7

or documents that purportedly showed the validity of the debt or the amount claimed owed on the debt.

41. Later that same week (specifically, on February 15, 2013), Mr. Julius appeared as a representative for AFB at a settlement conference held in the New Mexico federal district courthouse in Albuquerque. *See McGuire-Pike v. Audubon Financial Bureau*, No. 12-CV-945 (D. N.M.), Docket No. 30 filed 2/19/13 (Clerk's Minutes Regarding Rule 16 Settlement Conference).

42. On February 25, 2013, Wendell Sweet received the following email from AFB:

    Dear Account Holder,

    This is a friendly reminder for your arrangement agreed upon with your representative.

    Please make sure there are no issues with this transaction. If you have any questions please make sure you contact our office no later than the end of business today.

    1.866.595.3237
    or email is at
    response@audubonfinancialbureau.com

    Note: Please Do Not Reply to this e-mail. It was sent from an automated address. You will not receive a response.

43. On March 11, 2013, Wendell Sweet received the following email from AFB:

    Dear Account Holder,

    Your agreed upon arrangement with Jonh [sic] P. #22674, will be submitting your request for debit tomorrow for the amount of $1**.00. We appreciate your arrangement with us and hope to continue business in the future.

    Sincerely,
    Accounts Payable

    Note: Please Do Not Reply to this e-mail. It was sent from an automated address. You will not receive a response.

44. On March 12, 2013, Wendell Sweet received the following email from AFB:

   Dear Account Holder,
   You've recently agreed upon an arrangement for account number 485796 for the amount of $2**.13. If you have any questions regarding this arrangement please don't hesitate to contact our office at 1.866.595.3237.

   Note: Please Do Not Reply to this e-mail. It was sent from an automated address. You will not receive a response.

45. On March 14, 2013, Wendell Sweet received a telephone call on his cellphone from AFB. A man told him AFB was calling about "what had been agreed upon." Wendell Sweet told this man he had not agreed to anything and ended the call.

46. The same man from AFB again called Wendell Sweet on his cellphone one minute later. The man stated that he would record the call as a "refusal." Wendell Sweet told this man to not call him again and ended the call.

47. On March 18, 2013, Wendell Sweet received the following email from AFB:

   Dear Account Holder,
   You've recently agreed upon an arrangement for account number 485796 for the amount of $2**.13. The amount will be debited tomorrow am on you account ending in ***3. If you have any questions regarding this arrangement please don't hesitate to contact our office at 1.866.595.3237.

   Note: Please Do Not Reply to this e-mail. It was sent from an automated address. You will not receive a response.

48. Wendell Sweet never agreed to pay anything to AFB, never agreed to any sort of payment plan and never agreed to allow AFB to debit from any bank account.

49. By intentionally misrepresenting to Wendell Sweet that he had agreed to pay AFB or that he had agreed to a payment plan or that he had agreed to allow AFB to debit from his bank account, AFB was attempting to provoke Wendell Sweet into telephoning the number listed so that AFB could continue its harassment and attempts to collect.

50. Neither AFB nor DMP ever provided to either Plaintiff, orally or in writing, the recitation

9

of rights required by the FDCPA. *See* 15 U.S.C. § 1692g(a)(3), (4) and (5).

51. Mr. Julius is personally involved in the day to day operations of AFB.

52. Mr. Julius operates, oversees, approves, ratifies and is personally involved in the collection operation run under the name of AFB.

53. Mr. Julius formulates, implements and/or approves the debt collection practices generally employed by AFB.

54. Mr. Julius was personally involved in the activities undertaken by AFB to collect from Plaintiffs, including falsely telling the Attorney General employee and Wendell Sweet that AFB's license as a New Mexico collection agency "was being taken care of," or words to this effect, and falsely stated that AFB would provide verification of the debt.

55. AFP is not now licensed as a collection agency with the New Mexico Financial Institutions Division ("FID"), nor has it ever been licensed.

56. AFP has faced an FDCPA claim in the past based on its failure to be licensed as a collection agency in New Mexico. *See McGuire-Pike v. Audubon Financial Bureau*, No. 12-CV-945 (D. N.M.).

57. DMP is not now licensed as a collection agency with the FID, nor has it ever been licensed.

58. DMP was formerly licensed as a small loan company with the FID but it requested that this license be terminated on October 15, 2010.

59. AFP has faced FDCPA claims in the past, including in New Mexico, based on threats and misleading language substantially similar to the voicemail message it left for Steven Sweet on February 7, 2013. *See infra* ¶ 16. *See also e.g. McGuire-Pike v. Audubon Financial Bureau*, No. 12-CV-945 (D. N.M.). DMP has faced similar FDCPA claims as

10

well, although not in New Mexico, at least not until this lawsuit.

60. AFP has faced FDCPA claims in the past, including in New Mexico, based on threats and misleading statements delivered to family members of debtors, substantially similar to the voicemail message it left for Steven Sweet on February 7, 2013. *See infra* ¶ 16. *See also e.g. McGuire-Pike v. Audubon Financial Bureau*, No. 12-CV-945 (D. N.M.).

61. An award of punitive damages is appropriate to deter future similar conduct by AFP and DMP and other debt collection companies.

62. As a result of Defendants' actions or inactions, Plaintiffs have suffered actual damages, including:

   a. Out of pocket expenses;

   b. Lost time;

   c. Mental upset, mental anguish and emotional distress;

   d. Embarrassment and humiliation;

   e. Aggravation and frustration; and

   f. Harm to reputation and harm to good name.

### First Claim for Relief: Violations of the FDCPA

63. The actions and inactions of Defendants violate the FDCPA, including but not limited to 15 U.S.C. §§ 1692b(1), 1692b(2), 1692b(3), 1692c(b), 1692d, 1692d(6), 1692e, 1692e(1), 1692e(2)(A), 1692e(4), 1692e(5), 1692e(7), 1692e(10), 1692e(11), 1692e(14), 1692f and 1692g(a).

64. Plaintiffs are entitled to recover statutory damages, actual damages and attorney fees and costs.

## Second Claim for Relief: Violations of the New Mexico Unfair Practices Act

65. Defendants' actions constitute unfair or deceptive trade practices within the meaning of the New Mexico Unfair Practices Act ("UPA"), as defined by NMSA 1978 § 57-12-2(D) generally and NMSA 1978 § 57-12-2(D)(14) and (15) specifically.

66. Defendants willfully engaged in these unlawful trade practices.

67. Plaintiffs are entitled to recover actual or statutory damages, actual or statutory damages trebled, plus attorney fees and costs.

68. Plaintiffs are also entitled to injunctive relief under the UPA.

## Third Claim for Relief: Tortious Debt Collection

69. Defendants' actions and inactions constitute unreasonable and tortious debt collection practices in violation of the doctrine enunciated by the New Mexico Supreme Court in *Montgomery Ward v. Larragoite*, 81 N.M. 383, 467 P.2d 399 (1970).

70. Steven Sweet is entitled to recover actual and punitive damages.

## Fourth Claim for Relief: Defamation

71. Defendants defamed Wendell Sweet by stating to his son, Steven Sweet:

   a. Wendell Sweet must have forged Steven Sweet's signature on the loan contract;

   b. Wendell Sweet had listed Steven Sweet's name and social security number on the loan documents as a co-signor;

   c. Steven Sweet should prosecute Wendell Sweet because Wendell Sweet had lied to him; and

   d. Wendell Sweet was a "liar" with regard to whether Steven Sweet was a co-signer on the loan.

72. These statements recite factual matters and are false and defamatory.

73. Steven Sweet understood these statements to be defamatory.

74. Defendants knew that these statements were false or they made them with reckless disregard for whether they were false or not or they acted with malice. Alternately, Defendants negligently failed to recognize that these statements were false.

75. These statements caused actual injury to Wendell Sweet's reputation and good name.

76. Wendell Sweet is entitled to recover actual and punitive damages.

## Jury Demand

77. Plaintiffs request a seven person jury on all claims that can be tried to a jury.

## Request for Relief

Plaintiffs requests that this Court:

A. Award injunctive relief enjoining AFB and DMP from collecting on consumer debts in New Mexico:

   1. Without first obtaining a license as a collection agency with the FID;

   2. Via communications that include the use of threats and misleading language substantially similar to the voicemail message left for Steven Sweet on February 7, 2013;

   3. Via communications with family members of the debtor whereby information about the debt is revealed;

   4. Via communications to any family member of the debtor whereby the family member is told that he or she is personally responsible for paying off the debt, unless that statement is known and verified to be true; and

   5. Via communications with the debtor whereby the debtor is told that a payment arrangement has been made or that an account will be debited, unless that

        statement is known and verified to be true.

B.     Award statutory and actual damages for violations of the FDCPA;

C.     Award actual or statutory damages, actual or statutory damages trebled, for violations of the UPA;

D.     Award actual and punitive damages for tortious debt collection;

E.     Award actual and punitive damages for defamation;

F.     Award attorney fees and costs; and

G.     Award such other relief as the Court deems just and proper.

Respectfully submitted,

TREINEN LAW OFFICE PC

*/s/ Rob Treinen*

ROB TREINEN
500 Tijeras Ave NW
Albuquerque, New Mexico 87102
(505) 247-1980
(505) 843-7129 (fax)